UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHARLENE E. CHATTAMS, | : | Case No. 3:09-cv-187 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| PATRICK R. DONAHOE, | : | |
| POSTMASTER GENERAL, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (DOC. 24)

This civil case is before the Court on Defendant's Motion for Summary Judgment. (Doc. 24). Plaintiff filed a Memorandum in Opposing Defendant's Motion. (Doc. 26). Defendant filed a Reply Memorandum in Support of the Motion for Summary Judgment. (Doc. 30). The Motion is now ripe for decision.

## I. INTRODUCTION

This case involves claims of race discrimination by Plaintiff Charlene Chattams, an African-American female employee of the United States Postal Service. The crux of Plaintiff's claims concerns her application for promotion to the position of Postmaster of the Germantown, Ohio Post Office in late 2007. Plaintiff was not ultimately selected for the position. Instead, Harry Nuzzo, a white male employee of the Postal Service, was selected for the Postmaster position. Plaintiff claims that she was denied the promotion on the basis of her race. Plaintiff also contends that she was denied the opportunity to develop her skills on the basis of her race.

## II. FACTS

Plaintiff began her career as a clerk in the Dayton area Post Office in 1986.[1] (Docs. 24-1, 29). In 1993, the Postal Service promoted Plaintiff to the position of supervisor, customer service. (*Id.*) Over the next several years, Plaintiff received other promotions within the Postal Service in Southwestern Ohio (Cincinnati Postal District), including Camden, Vandalia and New Lebanon, Ohio. (Doc. 24-2).

In February 2001, Plaintiff was temporarily appointed the Officer in Charge ("OIC") of the Germantown, Ohio Post Office. (Docs. 24-1, 29). While serving as OIC of the Germantown Post Office in 2001, Plaintiff "received recognition for . . . outstanding performance as the Officer in Charge of the Germantown Post Office[.]" (Doc. 26-1). Plaintiff contends that she was also given a monetary award and received and excellent evaluation for her performance in that temporary role. (*Id.*)

In 2006, Plaintiff was promoted to the position of EAS-18 Postmaster of Camden, Ohio. (Docs. 24-1, 29). In late 2007, Plaintiff requested and was again temporarily appointed as OIC of the Germantown Post Office. (*Id.*) Cheryl Huhn ("Huhn"), a Caucasian female who was then serving as the EAS-24 Post Office Operations Manager ("POOM") for the portion of the Cincinnati District that included the Germantown Post Office, granted Plaintiff's requested appointment to that position. (Doc. 24-2). During the time Plaintiff served as the OIC of the Germantown Post Office following her 2007

---

[1] According to Plaintiff, she has four college degrees, *i.e.*, an associates degree in liberal arts, an associates degree in management, a bachelors degree in human resources, and a masters degree in education, all evidencing her superior qualifications. (Doc. 26-1).

appointment, she was essentially performing the duties that the Postmaster of that office would normally perform. According to Huhn, during the approximately four months that Ms. Chattams served as the OIC of the Germantown Post Office, sick leave usage and overtime hours increased in that facility. (Doc. 28).

In December 2007, while still serving as OIC of the Germantown Post Office, Plaintiff applied for the position of Postmaster for the Germantown Post Office: an EAS-20 level position. (Docs. 24-1, 29). In late January 2008, Plaintiff was one of seven applicants interviewed for the position by Huhn and Donald Kravos, an EAS-22 Postmaster for the Westerville, Ohio Post Office. (Docs. 24-5, 28).

According to Huhn, in filling the open Postmaster position for Germantown, the candidates were evaluated based on: (1) Form 991 applications; (2) each candidate's "KSAs" ( knowledge, skills and abilities as contained in the Form 991 applications); (3) each candidate's past and current job performances; and (4) each candidate's interview. (Doc. 28). With regard to the interviews, Huhn, assisted by Donald Kravos, the EAS-22 Postmaster of the Westerville, Ohio Post Office, interviewed the seven candidates in late January 2007. (Docs. 24-5, 28). Each candidate was interviewed separately by Huhn and Kravos. (*Id.*) Further, each candidate was asked the same questions. (*Id.*)

Following the interviews, Huhn ranked the seven candidates as follows: (1) Harry Nuzzo; (2) Mark Fiske; (3) Thad Thalheimer; (4) Landis Merriman; (5) Plaintiff Charlene Chattams; (6) Margaret Hamm; and (7) Tracie Gephart. (Doc. 28). Based on this

-3-

ranking, Ms. Huhn recommended that the top-ranked candidate, Harry Nuzzo, a white male, be selected as the EAS-20 Postmaster of the Germantown Post Office. (Doc. 24-5). Kravos also concluded that Nuzzo was the most qualified and capable person for Germantown Postmaster position. (Doc. 24-4).

According to Huhn, Nuzzo outranked the other candidates as a result of his interview and his demonstrated performance as OIC of the Vandalia, Ohio Post Office. (Doc. 28). With regard to his interview, Huhn specifically described it as "excellent." (Docs. 24-5, 28). Kravos described Nuzzo's interview as "exceptional" (Doc. 24-4). According to Huhn, Nuzzo gave detailed answers to most of the questions asked during the interview, including questions regarding his leadership philosophy and how to improve the Germantown Post Office. (Id.)

On the other hand, Huhn described Plaintiff's interview as "not very strong." (Doc. 24-5). According to Huhn, Plaintiff presented only vague answers on how to improve the Germantown office, despite serving as the OIC of that office at the time of the interview. (Docs. 24-5, 28). Kravos described Plaintiff's interview as puzzling, perplexing, surprising and weak. (Doc. 24-4). According to Kravos, Plaintiff's answers lacked detail and failed to demonstrate knowledge of the Germantown office, despite serving as the OIC in that office at the time of the interview. (Id.)

Aside from the interview, Huhn believed that Plaintiff was not ready for the EAS-20 position because Plaintiff experienced problems in her prior performance as a manager. (Doc. 28). Huhn expressed concern that the Germantown office "trended

-4-

towards a negative direction once the office was in her leadership." (Doc. 24-5). Nuzzo, on the other hand, had been successful in his most recent position as OIC of the Vandalia office, an "office [that] had many problems before his arrival." (Doc. 24-5, 28).

In June 2008, Plaintiff filed a formal administrative complaint with the Postal Service. On February 9, 2009, Plaintiff was issued a Final Agency Decision finding no discrimination. (Docs. 24-1. 29). In May 2009, Plaintiff filed this action alleging discrimination on the basis of race. Defendant now moves for summary judgment on all claims. (Doc. 24).

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citing Fed. R. Civ. P. 56(e)(2)). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)(2)).

## IV. ANALYSIS

Defendant moves for summary judgment on all claims asserted by Plaintiff, namely: (1) Plaintiff's disparate impact claim asserting that Defendant fails to provide African-American employees "an equal opportunity to develop, or further develop, the skills necessary to fairly compete for advancement[;]" and (2) Plaintiff's disparate treatment claim asserting that "Defendant discriminated against the Plaintiff by refusing to promote the Plaintiff to the position of Postmaster, EAS-20, at Germantown, Ohio, because of her race[.]" (Doc. 5).

### A.     Disparate Impact - Failure to Provide Training Based Upon Race

Plaintiff asserts a claim based on a disparate impact theory arguing that Defendant "has failed to provide African-American employees with equal opportunity for training and skill development." (Doc. 26). Defendant moves for summary judgment on Plaintiff's purported disparate impact claim, arguing that Plaintiff waived this claim by failing to exhaust administrative remedies. Alternatively, Defendant argues that there is no evidence, admissible or otherwise, supporting Plaintiff's contention.

-6-

"The disparate impact theory requires a plaintiff to demonstrate that a facially neutral employment practice falls more harshly on one group than another and that the practice is not justified by business necessity." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626, 629 (6th Cir. 2008) (citing *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 92 (6th Cir.1982)).  Generally:

> to prove a *prima facie* case of disparate impact, plaintiffs must (1) identify a specific employment practice; and (2) "show an adverse effect caused by the employment practice by offering 'statistical evidence of a kind or degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs ... because of their membership in a protected group.'"

*Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 419 (6th Cir. 1999) (citations omitted).

With regard to the first prong of a *prima facie* disparate impact claim, Plaintiff acknowledges that she is required to identify a specific employment practice that is facially neutral. *See Guster v. Hamilton Cnty. Dept. of Educ.*, No. 1:02-cv-145, 2004 WL 1854181 at *29 (E.D. Tenn. Mar. 2, 2004).  Here, the specific alleged employment practice complained of is Defendant's alleged failure "to provide African-Americans employees with equal opportunity for training and skill development." (Doc. 26).

Initially, the Court notes that Plaintiff points to no evidence, beyond conclusory assertions in Plaintiff's EEOC complaint and factually unsupported conclusory statements in her affidavit, to support the existence of such an employment practice.  (Doc. 26-1). Further, even assuming some evidence supported the contention that Defendant denies African-American employees equal opportunity for training and skill development, such

an employment practice is not facially neutral. Thus, Plaintiff fails to establish the first

prong of a *prima facie* disparate impact claim.

With regard to the second prong of a *prima facie* disparate impact claim, Plaintiff

must point to some statistical or other evidence showing a disparity between "'the racial

composition of [the at-issue jobs] and the racial composition of the qualified . . .

population in the relevant labor market.'" *Alexander*, 177 F.3d at 419 (citations omitted)

(alterations in original). Here, Plaintiff points to an unauthenticated, unverified,

uncertified document captioned "ASSOCIATE OFFICES OHIO" which purports to list a

number of Associate Offices in Ohio, the name of each office's Postmaster, and,

presumably, that Postmaster's race and gender.[2] (Doc. 26-8).

Defendant contests the admissibility of the unverified and unauthenticated

document. Certainly, the document is unverified and unauthenticated. Additionally, in

reviewing the document, there is absolutely no indica that the information therein is in

anyway reliable. There is nothing indicating who prepared this document, whether it was

prepared in the ordinary course of business, and when, if ever, this information was

accurate.[3] Because the document relied upon by Plaintiff is not properly verified and/or

authenticated, it is not admissible for purposes of summary judgment. *See Chandler v.*

---

[2] With regard to the information regarding race and gender, the Court assumes that the notations on the document of "WM" refer to a "white male" and "BF" to a "black female."

[3] Questions abound regarding the accuracy and authenticity of the document and its relevance to the time frame at issue in this case. Initially, assuming that the notation "WM" refers to a white male, the Court notes that individuals with the first names Andrea, Jill and Constance are noted on the document as males. (Doc. 24-5). The Court also notes that the document lists Harry Nuzzo as the OIC of the Miamisburg office. However, the record in this case reveals that, before Nuzzo's ultimate selection as the Postmaster of Germantown, he was the OIC of the Vandalia, Ohio office. (Doc. 24-5, 28). Elaine Huhn's memorandum, dated January 1, 2008, in which she makes her ultimate recommendation for the Germantown Postmaster position, states that "Harry Nuzzo is currently the Postmaster of New Lebanon Ohio . . . [and] is actively the Officer in Charge in Vandalia EAS – 20." (Doc. 24-5).

*Potter*, No. C-1-04-486, 2006 WL 143272 at *4 (S.D. Ohio Jan. 18, 2006) (concluding that unverified and unauthenticated documents were hearsay and inadmissible "to support a motion for summary judgment").

Nevertheless, even assuming the truth of the information set forth in the document regarding the racial composition of certain positions at certain Ohio post offices,[4] and assuming such information is relevant to the time period at issue here, Plaintiff provides no comparative statistical evidence demonstrating "the qualified population in the relevant labor market." *Driggers v. City of Owensboro, Kentucky*, 110 Fed. Appx. 499, 509 (6th Cir. 2004) (concluding that statistical evidence was "not probative of sex discrimination . . . because it fail[ed] to compare the gender composition of the police force to the qualified population in the relevant labor market") (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977)); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 761-62 (6th Cir. 2000) (concluding that "statistics relating to the percentage of minority supervisors . . . were not admissible because he did not establish the number of qualified minorities available in each labor market").

Based on all of the foregoing, Plaintiff's purported disparate impact claim must fail on summary judgment, and Defendant's Motion in this regard is **GRANTED**.[5]

---

[4] Assuming the two-letter notations on the document refer to race and gender (*i.e.*, "WM" referring to a white male, "WF" referring to a white female, "HF" referring to a Hispanic female, and "BF" referring to a black female), two of the approximately 68 offices listed were held by black females.

[5] Insofar as Plaintiff's claim could be construed as a pattern or practice claim, the Court notes that "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs." *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *see also Strader v. Am. Fed'n of State, Cnty and Mun. Employees, Local 1027*, No. 1:04cv829, 2006 WL 2373182, at *3 n 2 (S.D. Ohio Aug. 16, 2006) (concluding that, because plaintiff brought a purported pattern-and-practice claim "as an individual, he cannot proceed on the pattern-or-practice method of proving discrimination").

**B.**     **Disparate Treatment - Failure to Promote Based on Race**

Next, Defendant moves for summary judgment on Plaintiff's disparate treatment claim in which Plaintiff asserts that "Defendant discriminated against the Plaintiff by refusing to promote the Plaintiff to the position of Postmaster, EAS-20, at Germantown, Ohio, because of her race[.]" (Doc. 5). In seeking summary judgment, Defendant argues that Plaintiff cannot demonstrate that the reasons given for her non-selection were a pretext to race discrimination.

Plaintiffs alleging discrimination under Title VII "may produce either direct or circumstantial evidence of discrimination" in an effort to prevail on their claims. *Bartlett v. Gates*, 421 Fed. Appx. 485, 487 (6th Cir. 2010). Here, the parties do not dispute the absence of direct evidence. Absent direct evidence of discrimination, a claim of discrimination under Title VII is under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *Id.* at 488.

The first stage in analyzing discrimination claims pursuant to the *McDonnell Douglas* framework requires that Plaintiff evidence a *prima facie* case of discrimination. *Bartlett*, 421 Fed. Appx. at 488. To "establish a *prima facie* case of discrimination in the context of promotions[,]" plaintiffs must show that "they (1) are a member of a protected class; (2) objectively qualified for the promotion sought; (3) [were] considered for but denied the promotion; (4) and the selectee is an individual outside of plaintiff's protected class." *Id.* (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584-85 (6th Cir.2009)); *see*

-10-

*also Plumb v. Potter*, 212 Fed. Appx 472, 478 (6th Cir. 2007).

Where a plaintiff satisfies the burden of proving "a *prima facie* case, the burden

shifts to the employer to 'articulate a nondiscriminatory reason for its action.'" *Id*. (citing

*Harris v. Metro. Gov. of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th

Cir.2010)). "Employers who provide a legitimate, non-discriminatory reason for their

promotion decision will be entitled to summary judgment unless plaintiffs can rebut the

employer's explanation by demonstrating pretext." *Id*.

"To establish pretext, a plaintiff must show that an employer's stated reason:

(1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was

insufficient to explain the challenged conduct." *Simpson v. Vanderbilt Univ.*, 359 Fed.

Appx. 562, 569-70 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29

F.3d 1078 (6th Cir.1994)); *see also Bartlett*, 421 Fed. Appx. at 490.  To meet this burden,

a plaintiff must present "'sufficient evidence from which the jury could reasonably reject

[the defendants'] explanation and infer that the defendants intentionally discriminated

against him.'" *Id*. (citations omitted).  Further, "a reason cannot be proved to be 'a

pretext for discrimination' unless it is shown both that the reason was false, and that

discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

515-16 (1993); *see also Simpson*, 359 Fed. Appx. at 570.

Importantly, even though "the burdens of production shift, '[t]he ultimate burden

of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff.'" *Risch v. Royal Oak Police Dept.*, 581

-11-

F.3d 383, 391 (6th Cir. 2009). On a motion for summary judgment, this court "considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Id.* at 390-91 (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir.2007); *Cline v. Catholic Dioc. of Toledo*, 206 F.3d 651, 661 (6th Cir.2000)).

Here, for summary judgment purposes, Defendant does not dispute the existence of a *prima facie* case, and Plaintiff does not dispute that Defendant meets its burden of articulating a nondiscriminatory reason for Plaintiff's non-selection, *i.e.*, that another employee was a better candidate, interviewed better and had better past job performance. As a result, the critical inquiry for summary judgment purposes is whether the nondiscriminatory reason proffered by Defendant is evidenced to be merely a pretext for unlawful discrimination.

Plaintiff seeks to demonstrate pretext by arguing that: (1) Plaintiff was more qualified than the individual ultimately selected for the position; (2) the selection process, and specifically the interview process, was subjectively rated; and (3) that the interviewing officials, including the selecting official, did not consider the Postal Service's affirmative action plan.[6]

### 1.    Qualifications of Applicants

Plaintiff suggests that pretext is evident because she was allegedly a more qualified

---

[6] Plaintiff also references prior allegations of discrimination lodged against Huhn by other employees. With regard to the previous complaints against Huhn, Plaintiff makes no effort to substantiate the validity of the complaints in those cases, relate those complaints to the promotion decision in this case, or present any evidence whatsoever with regard to those complaints. Accordingly, the Court finds that the simple fact others alleged discrimination on the part of Huhn, without more, is an insufficient basis to demonstrate pretext and withstand summary judgment. *See Burke-Johnson v. Dep't of Veterans Affairs*, 211 Fed. Appx. 442, 446-49 (6th Cir. 2006).

than the ultimate selectee. The Sixth Circuit concludes that "[e]vidence that the plaintiff was more qualified than the successful applicant can in some circumstances be sufficient to raise a genuine issue of material fact that the employer's proffered explanation is pretextual." *Risch*, 581 F.3d at 391-92 (citations omitted). However:

> the probative value of qualifications evidence in terms of demonstrating pretext must be balanced against "the principles that employers are generally 'free to choose among qualified candidates,' [quoting] *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987), and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with,' [quoting] *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir.1996).

*Burke-Johnson v. Dep't. Veterans Affairs*, 211 Fed. Appx. 442, 450 (6th Cir. 2006) (alterations in original).

Whether disparities in the relative qualifications of a selectee and non-selectee create issues of facts regarding pretext depends "on whether a plaintiff presents other evidence of discrimination." *Risch*, 581 F.3d at 392 (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626-27 (6th Cir.2006), *cert. denied*, 550 U.S. 904, 127 S.Ct. 2100, 167 L.Ed.2d 814 (2007)); *see also Burke-Johnson*, 211 Fed. Appx. at 450. Where such "other probative evidence of discrimination" exists, "that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment." *Id*. (citations omitted).

However, "in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must

be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender*, 455 F.3d at 627. In other words, "evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Id.*

Here, Plaintiff points to her four college degrees, *i.e.*, an associates degree in liberal arts, an associates degree in management, a bachelors degree in human resources, and a masters degree in education, to show her superior qualifications. (Doc. 26-1). Nuzzo, on the other hand, attended Sam Houston State for business, completed 24 hours in accounting, but obtained no degree. (Docs. 24-5, 28). Defendant does not dispute that Plaintiff possesses a superior educational background; however, according to Huhn, she did not base her decision on the education of the applicants. (Doc. 28).

Next, in arguing that she was more qualified that Nuzzo, Plaintiff points to her affidavit testimony stating that she served as OIC of the Germantown Post Office in 2001. (Doc. 26-1). During that time, she "received recognition for . . . outstanding performance as the Officer in Charge of the Germantown Post Office[.]" (*Id.*) Further, Plaintiff states that she was given a monetary award and received and excellent evaluation for her performance in that role. (*Id.*) However, during her more recent stint as OIC of the Germantown Post Office, "the performance of the office tended toward a negative direction once the office was in her leadership." (Docs. 24-5, 28). Nuzzo, on the other

-14-

hand, had been successful in his most recent position as OIC of Vandalia. (Doc. 28).

Further, aside from educational background, work experience and recent performance, the selecting officials viewed Nuzzo as the more qualified candidate because he performed extremely well during the interview process by providing detailed plans on how to improve the Germantown office and specifically described his leadership philosophy. (Doc. 28). Plaintiff, on the other hand, was unable to provide any specific plan for making improvements to the Germantown Post Office despite serving as the OIC of that office for the month immediately preceding the interview. (Docs. 24-4, 24-5, 28).

Huhn and Kravos reasonably expected that, because Plaintiff had already spent a month in charge of the Germantown office, and, therefore, was more intimately familiar with the problems faced by that office, her interview answers should have been specific rather than the vague, puzzling and perplexing answers she purportedly gave. (*Id.*) Certainly, Plaintiff does not dispute the fact that she "did not respond with specifics regarding [her] brief assignment" at the Germantown Post Office. (Doc. 26-1).

Essentially, while Plaintiff can make an argument that she was the more qualified candidate based on her educational background, years of experience, and previous successful experience as the OIC of the Germantown office, the Court is unable to conclude that she was such a significantly better candidate that Nuzzo that no reasonable employer would have selected Nuzzo for the position. Therefore, to demonstrate pretext sufficient to avoid summary judgment, Plaintiff must point to some other probative evidence of discrimination.

### 2. Subjectivity in the Selection Process

Plaintiff next contends that "[t]he highly subjective nature of the selection process permitted the interviewers an opportunity to manipulate the results to exclude African-American candidates." (Doc. 26). To illustrate the subjective nature of the interview process and the opportunity to manipulate the results of the process, Plaintiff points to evidence that the interviewers created their own interview questions, that the interviewers did not keep a clear record of answers to the interview questions, and that Ms. Huhn was unable to describe important credentials she looked for in candidates. (Doc. 26).

Courts have concluded that "the use of subjective criteria alone will not establish pretext." *Cotton v. City of Franklin*, No. 3:09-cv215, 2010 WL 3521751, at *11 (W.D. Tenn. Sept. 7, 2010) (citing *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006)). Instead, "the use of subjective criteria must be considered in conjunction with . . . other evidence of pretext." *Id.*

Here, each candidate interviewed was asked the exact same questions formulated by Kravos and Huhn. (Docs. 24-5, 28). Aside from a general assertion that rating the interview answers was a subjective task, Plaintiff points to no evidence whatsoever to support her general, conclusory contention that the formulation of the answers themselves were in furtherance of a discriminatory motive. In fact, at one point in response to Defendant's Motion for Summary Judgment, Plaintiff states that her claim "is not that specific interview questions were discriminatory." (Doc. 26). Simply put, while the ultimate rating of the interviews involved subjectivity, the Court simply cannot find

pretext merely because Huhn and Kravos formulated their own questions. This is especially true where Plaintiff does not argue that the questions themselves were discriminatory.

Further, Plaintiff points to nothing material in the rating of the overall responses that suggests a discriminatory motive. Plaintiff cites to Kravos's deposition testimony in an effort to demonstrate "how impressed he was with Margaret Hamm's (a white female applicant) exceptional interview." (Doc. 26). However, nothing in the pinpoint citation offered by Plaintiff mentions an opinion of Hamm's interview. Further, Hamm was ultimately rated lower overall than Plaintiff. (Doc. 28).

Next, Plaintiff vehemently argues that Plaintiff was held to a higher standard during the interview process. Plaintiff's argument appears to center around testimony from both Huhn and Kravos that Plaintiff's interview was rated poor because she failed to express any specifics about improving any aspect of the Germantown office despite having been the OIC in that office for the month preceding the interview.

Insofar as Plaintiff was held to a higher standard during the interview process, that higher standard was placed on her because of her familiarity with the position for which she was interviewing, not on account of her race or any other factor. Nowhere does Plaintiff point to any evidence to the contrary. In fact, having served as the active leader of the Germantown office for at least a month before her interview (not counting her earlier assignment as OIC in Germantown years earlier), it is wholly realistic and reasonable for Kravos and Huhn to have expected Plaintiff to give more than vague and

general plans to improve the office. This is so especially where other interviewees with less familiarity expressed detailed plans in that regard.

Finally, Plaintiff contends that Huhn "failed to develop a clear record that justifies the promotion decision" and that her notes contain "glaring omissions." (Doc. 26). Initially, the Court notes that, in support of the Motion for Summary Judgment, Defendant submits the interviewers' handwritten notes to each question posed to each of the seven candidates interviewed. (Docs. 24-5, pp. 42-74). In addition, Defendants submits a memorandum dated February 1, 2008, authored by Huhn, which summarizes "the interviews, the knowledge and skill of the candidates." (Doc. 24-5, pp. 38-41). The Court finds that Huhn certainly created a record when making the promotion decision.

In arguing that the record created does not justify the ultimate decision, and that it contains "glaring omissions," Plaintiff fails to expound or elaborate on that conclusory assertion other than simply citing to pages in Huhn's deposition. (Doc. 26). First, Plaintiff points to testimony wherein Huhn states that her notes did not reflect whether or not any candidate spoke how they improved some aspect or function of their own office during their interview. (Doc. 28). The Court does not see how this purported omission demonstrates race discrimination when it is clear why Huhn and Kravos expected such information from Plaintiff, *i.e.*, at the time of the interview she was filling the position for which she was interviewing, whereas the other candidates were not.

Plaintiff also points to Huhn's failure to specifically recall the flash report she reviewed in evaluating Plaintiff's performance at the Germantown office. (Doc. 26). It is

not specifically clear how this testimony demonstrates pretext.  Plaintiff points to no

specific evidence rebutting Huhn's testimony that the Germantown office declined while

Plaintiff was the OIC in 2007 and 2008.  Further Plaintiff points to no report

contradicting Huhn's conclusions that the Germantown office did not improve under

Plaintiff's leadership during that time frame.

Finally, Plaintiff cites Huhn's testimony wherein Huhn did not recall how she

determined the extent of Nuzzo's rural or city delivery experience.  Such testimony was

elicited in response to Huhn's statement in an EEOC affidavit where she states that, in

addition to not selecting Plaintiff based on "the interview process, her demonstrated

performance as the OIC of Germantown and performance in her assigned position of

Camden, OH," Plaintiff:

> *also* did not have a strong background in city delivery which made a
> difference since there were 3 city routes.  I [Huhn] had given her the
> opportunity to show me what she could do as far as managing more
> employees, and implementing proceeses to fix the task she was
> assigned.  I felt that Ms. Chattams' needed more mentoring and
> development in managing people, city delivery, rural delivery, and
> Function 4 and she was not ready to move on to the next level.

(Doc. 24-5) (emphasis added).  Even if Huhn's conclusion about Plaintiff's need for

additional mentoring and development in rural and city delivery were unfounded, or

Nuzzo had less experience in that regard, such findings would be insufficient to show

pretext.

Significantly, Plaintiff points to no evidence negating the most significant reasons

why Nuzzo was promoted over Plaintiff, *i.e.*, the strength of Nuzzo interview, the

weakness of Plaintiff's interview, Nuzzo's success at Vandalia, and Plaintiff's low performance at Germantown in 2008. *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 504 (6th Cir. 2007) (stating that "summary judgment is appropriate . . . if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position"); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (stating that "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation").

Accordingly, although the ultimate rating of the applicants' interview responses involved a degree of subjectivity, such subjectivity is insufficient in and of itself to demonstrate pretext without some other probative evidence of a discriminatory animus.

### 3. Affirmative Action Plan

Finally, Plaintiff points to provisions from what appear to be Postal Service employment manuals or handbooks that relate to affirmative action.[7] Further, Plaintiff cites Huhn's testimony in an effort to show that she does not use the Postal Service's affirmative action plan it in making her promotion decisions. (Doc. 28). Plaintiff also references testimony from Kravos wherein he testified that if the Postal Service has an affirmative action plan, he was unaware of it. (Doc. 26-2).

Initially, with regard to the statements of Huhn and Kravos, the quotations in

---

[7] Plaintiff attached three exhibits (Docs. 26-4, 26-5, 26-7) to her Memorandum Opposing Defendant's Motion for Summary Judgment. The Memorandum itself simply cites to certain provisions within the exhibits without any further elaboration or argument as to whether or how the provisions apply to this case.

Plaintiff's Memorandum are selective and fail to reveal the totality of their testimony.

The entirety of Huhn's testimony regarding affirmative action is as follows:

> Q. Okay. Race, you say race did not play a role in your decision-making?
>
> A. That's correct.
>
> Q. Did you consider race at all?
>
> A. No.
>
> Q. Did you have a duty to consider race?
>
> A. No.
>
> Q. What do you base that on? Let me ask you that a different way. Does the Postal Service have an affirmative action plan as it applies to promotions?
>
> A. Yes.
>
> Q. Were you given any training on that?
>
> A. Yes.
>
> Q. And so when you make a decision on promotion, do you consider the Postal Service's affirmative action plan?
>
> A. Yes.
>
> Q. Does that affirmative action plan discuss race at all?
>
> A. Yes.
>
> Q. So would you like to change your previous answer that you do - -
>
> A. When I determine in these positions, I base it on qualifications, my experience is what I see the person performing, knowledge, skills, and abilities.

Q. And to be clear, I am not trying to trap you in anything here, I am just saying to the extent that there is an affirmative action plan, how do you consider that in your promotion decisions?

A. I know it's there, but I don't use that for the promotions.

Q. So you don't consider the affirmative action plan in making a promotion decision?

A. I know that that's the law for the affirmative action, but again I don't consider - -

MR. QUINN: He can't ask you a legal question because you don't have the license. It took me a long time to get one.

THE WITNESS: Okay.

MR. QUINN: But he can ask you your interpretations of the postal policies as a manager or senior manager, and I think that's what he's intending to do. So just tell him what your understanding of what you are supposed to do when you promote or select somebody for promotion is.

THE WITNESS: Okay. Don't base it on race, creed, age sex.

BY MR. CARTER:

Q. Okay. What is the affirmative action plan as they trained you? If you know.

A. I'd have to - - I can't remember off the top of my head.

(Doc. 28). The entirety of Kravos's testimony regarding affirmative action is as follows:

A. A large government agency has definitely a criteria of or an a semblance of diverse cultures, and your leadership should reflect that.

Q. Okay.

-22-

A. And we should promote it in the federal government. And it depends on your workforce.

Q. So is that something that's present in your mind when you are going through your selection process?

A. Well, certainly. I am part of the diversity committee so it's always in my mind to promote that. But does it have it - - is it a strong indicator of it, no.

Q. Tell me what you mean when you say is it a strong indicator of it.

A. I don't go into it, into an interview process thinking I've got to promote diversity. I go by merit. But if all things are equal, then you would promote diversity.

Q. And let me make sure I understand what you're saying. You're saying that if you've got two applicants equally qualified, that if there is an opportunity to promote diversity, that's what you have a duty to do? Is that what you believe?

A. Well, I would certainly think that that's a strong point to make, yes.

Q. And I don't want to misstate your position, so if I'm not - -

A. Right. The fact is if merit is equal, you would promote diversity.

Q. And is it your position that that's what the book instructs you to do or the training instructs you to do?

A. Everything within our diversity training has promoted that.

Q. Okay.

A. So it's not just my book, it's everything that I know and love and hold in my heart in the American way.

Q. So does the Postal Service, if you know, have an affirmative action plan?

A. I don't know if it would considered affirmative action plan.

Q. So if there is such a thing as an affirmative action plan, you are not aware of it?

A. I am not.

(Doc. 26-2). In referencing the selective passages from this testimony of Huhn and

Kravos, Plaintiff attempts to demonstrate pretext by arguing that Huhn and Kravos could

not have considered affirmative action provisions if they did not know what those

provisions require.[8]

Unfortunately, beyond merely citing to provisions regarding "Special Emphasis

Programs," "Diversity Development," and provisions setting forth procedures for filling

EAS positions,[9] Plaintiff makes absolutely no argument (and points to no evidence) as to

how Huhn or Kravos violated any of the provisions, assuming they even apply, or any

other affirmative action provision maintained by the Postal Service. Absent any specific

argument and evidence as to how Huhn and/or Kravos violated any of the Postal

Service's affirmative action goals or provisions, Plaintiff's references in this regard are

insufficient to create an issue of fact regarding pretext.

---

[8] In the Memorandum in Opposition, Plaintiff specifically states that "[s]ince Ms. Huhn did not know what the agency's affirmative action plan or diversity developments plan was, she could not have considered them in making this selection." (Doc. 26).

[9] Notably, Plaintiff citation to this provision references a section 747.4 which is not contained within the exhibit provided. The final provision provided by Plaintiff refers to selecting officials and requires that selecting officials are responsible for ensuring "that selections are made in accordance with all applicable selection principles, including equal opportunity law, the Affirmative Action program, and diversity objectives." (Doc. 26-6).

### 4.    Conclusion - Plaintiff Fails to Demonstrate Pretext

For all of the foregoing reasons, no reasonable juror could conclude that Defendant's proffered reason for not promoting Plaintiff was merely a pretext for discrimination.  Accordingly, Defendant's Motion with regard to Plaintiff's disparate treatment claim is **GRANTED**.

## IV.  CONCLUSION

For the forgoing reasons, there being no genuine issue as to any material fact, and Defendant being entitled to judgment as a matter of law, Defendant's Motion for Summary Judgment (Doc. 24) is **GRANTED** in its entirety.

**IT IS SO ORDERED.**

Date:  _10/31/11_

_Timothy S. Black_
Timothy S. Black
United States District Judge